UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————

№ 09-cv-5248 (JFB)(ARL)

———————————

NEIL FISHMAN, BY HIS LEGAL GUARDIAN, SELMA FISHMAN, AND SURUJ SIRIKESHUN,
INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiffs,

VERSUS

RICHARD F. DAINES, M.D., AS COMMISSIONER OF THE NEW YORK STATE
DEPARTMENT OF HEALTH, AND JOHN PAOLUCCI, AS DEPUTY COMMISSIONER OF THE
OFFICE OF TEMPORARY AND DISABILITY ASSISTANCE OF THE NEW YORK STATE
DEPARTMENT OF FAMILY ASSISTANCE,

Defendants.

———————————

**MEMORANDUM AND ORDER**
September 16, 2014

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiffs Neil Fishman (through his legal guardian, hereinafter "Fishman") and Suruj Sirikeshun bring this class action against Richard Daines, the Commissioner of the New York State Department of Health, and against the Deputy Commissioner of the Office of Temporary and Disability Assistance of the New York State Department of Family Assistance (OTDA), who was formerly John Paolucci, but is now Kristen Proud.

The present motion seeks a preliminary injunction requiring defendants to mail a "default notice" to members of the plaintiff class before their Medicaid appeals are abandoned because they missed a scheduled hearing. By its terms, the requested injunction would prohibit "defendants from dismissing the administrative appeals of defaulting Medicaid appellants who are not given at least 10 days to respond to a written notice from defendants inquiring if they want their administrative appeals rescheduled." (Pl. Not. of Mot.)

For the reasons discussed below, the Court denies plaintiffs' motion. In short, plaintiffs have not made a clear showing that they are likely to succeed on the merits because, based upon the current record, the Court concludes that the existing notice provided by defendants—which includes three letters mailed separately to plaintiffs—is reasonably calculated to comply with due process, especially in light of a recent regulatory change which extends a Medicaid

claimant's time to reschedule a defaulted fair hearing. Analyzed under the test established in *Mathews v. Eldridge*, 424 U.S. 319 (1976), the risk of error in the absence of a default notice is low, as is the probable value of such notice, which would constitute a fourth letter to plaintiffs after defendants have already mailed them three others. The letter would entail additional financial and administrative costs which, while not prohibitive, must be considered in light of defendants' other expenses in issuing the first three letters and staffing the telephone system.

Moreover, notwithstanding any ongoing issues with the automated telephone system, the Court concludes that plaintiffs have failed to demonstrate, at this juncture, any likelihood of showing that any such issues rise to a due process violation in light of (1) the recent amendments to N.Y.C.R.R. 358-5.5, and (2) the availability of numerous other methods of obtaining an adjournment, including in-person, by letter, by fax and by the internet. Accordingly, plaintiffs have not made a clear showing that they are likely to succeed on their due process or statutory claims, and their motion for a preliminary injunction is denied. Of course, plaintiffs are free to renew this motion if they uncover any new evidence that, notwithstanding the amendments to Section 358-5.5 and the availability of these other methods for obtaining an adjournment, the current procedures are insufficient to protect claimants' due process rights.

I. BACKGROUND

A. Factual and Legal Background

The background facts of this case, including an overview of the Medicaid system and appeals process, are set forth more fully in this Court's opinion denying, in large part, defendants' motion to dismiss. *See Fishman v. Daines*, 743 F. Supp. 2d 127 (E.D.N.Y. 2010). In short, this case involves the procedures by which defendants determine that a Medicaid appeal is abandoned. After defendants conclude that a claimant is no longer entitled to Medicaid benefits, they inform the claimant by letter, and advise him that he may request a fair hearing. (*See* Pl. Ex. A238; 18 N.Y.C.R.R. § 358-3.5.) If the request is timely, the person may continue to receive "aid-continuing" Medicaid coverage pending the outcome of the hearing, 18 N.Y.C.R.R. § 358-3.6, and defendants send two additional letters: first, they send an acknowledgement that a fair hearing has been requested (*see* Pl. Ex. A33), and then they send notice that the fair hearing has been scheduled, which includes logistical details and instructions for requesting adjournments (*id.* A35; 18 N.Y.C.R.R. § 358-5.1(a)).

However, plaintiffs' counsel contends that 880 members of the plaintiff class never received a fair-hearing notice. If a person does not attend his fair hearing, whether because he did not receive notice or for any other reason, he is considered to have defaulted his hearing, and risks having his appeal abandoned. 18 N.Y.C.R.R. § 358-5.5(a). It is possible to restore a defaulted hearing to the calendar, but the timing of the request to do so affects the continuing provision of Medicaid coverage. *Id.* § 358-5.5(c). Plaintiffs contend that many class members lost aid-continuing coverage, at least temporarily, because they did not realize that they missed their fair hearing. Of the 880 who allege that they never received a fair-hearing notice, plaintiffs contend that 452 lost their aid-continuing coverage for some period of time. (*See* Vollmer Decl. ¶ 28.)

The default notice requested by plaintiffs would be a fourth letter sent from defendants to the same address as the first three. As is discussed in more detail below, defendants issued a default notice by stipulation for approximately two years, and plaintiffs contend that there was a 20% increase in the number of defaulted hearings which were rescheduled. In its previous opinion, this Court also noted that a default notice is contemplated by the State Medicaid Manual, which is "an informal rule issued by the Department of Health and Human Services' . . . Centers for Medicare and Medicaid Services." *Wong v. Doar*, 571 F.3d 247, 250 (2d Cir. 2009).[1]

In plaintiffs' view, the default notice is constitutionally necessary because some number of claimants never receive notice of their fair hearing, and also because those who do receive notice may default their fair hearing because it is so difficult to obtain an adjournment. Plaintiffs cite numerous examples of claimants with legitimate cause for adjournments who could not obtain them because defendants' telephone system is inadequate. The system routes calls into four queues, and calls concerning fair hearings fall into the lowest order of priority. (Vollmer Decl. ¶ 51.) In its opinion on defendants' motion to dismiss, this Court observed that "[t]he complaint and supporting papers set forth abundant data showing that callers to the line are often met with busy signals or inexorable waiting times." 743 F. Supp. 2d at 147. Calls from all over the state of New York are routed into this single system, which has not increased the number of calls it can keep on hold at once since 2000, even though the volume of calls has risen. (Vollmer Decl. ¶¶ 58-59.) The system holds 11 calls from across New York State on the adjournment line at once (*id.* ¶¶ 62-64), and these 11 calls proceed through an automated system which provides information about alternative ways to contact defendants, and which required an average of approximately 6 minutes' wait time in March and April 2014. (Mathieu Decl. ¶¶ 5-7.) Plaintiffs have submitted data that, in 2013, only 18% of calls to the adjournment line reached the automated system. (Vollmer Suppl. Decl ¶¶ 23-24.) The other 82% of calls received a busy signal. (*Id.*) Relying on this data, plaintiffs argue that claimants seeking adjournments, particularly on short notice, are unlikely to obtain one, and may erroneously lose benefits as a result if they do not receive written notice allowing them to avoid default without relying on the telephone system.

B. Procedural Background

After the Court issued its opinion on the motion to dismiss in 2010, the parties reached a comprehensive stipulation, which the Court ordered effective on April 6, 2011. Among other things, the stipulation certified the case as a class action, on behalf of "[a]ll past, present, and future applicants and recipients of Medical Assistance . . . in New York State who: (a) requested or will request an administrative fair hearing . . . (b) failed or will fail to appear in-person . . .

---

[1] To the extent that plaintiffs suggest that the Medicaid Manual is "controlling" (Pl. Reply Mem. at 2), and that therefore the failure to issue a default notice is a violation of federal law distinct from due process, they cite no authority for that proposition, which would conflict with the Second Circuit's application of *Skidmore* deference to the Manual. *See Wong*, 571 F.3d at 260. Furthermore, the Court notes that the portion of the Manual cited by plaintiffs is permissive rather than mandatory. It states simply that "[t]he hearing request may be considered abandoned when neither the claimant nor his representative appears at a scheduled hearing, and if within a reasonable time (of not less than 10 days) after the mailing of an inquiry as to whether he wishes any further action on his request for a hearing no reply is received." (Pl. Ex. A6.)

3

and (c) suffered or will suffer dismissal of their administrative appeal without defendants' prior written inquiry."[2] (Dkt. No. 69 ¶ 1.) The stipulation also required defendants to begin issuing letters to prospective class members who defaulted their fair hearings. (*Id.* ¶ 3(b).) The letters asked class members if their hearing request was abandoned, and advised them that if they intended to reschedule their hearing, they must provide good cause for having defaulted. The letter also required the class members to respond within ten days of the letter's mailing date, or else their hearing request would be deemed abandoned. (*Id.*) The letters were issued for approximately two years, between the date the Court so-ordered the stipulation on April 6, 2011, and the date it was vacated on September 16, 2013.

The stipulation also included a provision exempting prospective class members from the requirements of 18 N.Y.C.R.R. § 358-5.5. (*Id.* ¶ 3(f).) At that time, § 358-5.5 required defaulting Medicaid appellants to request that their hearing be rescheduled within 15 days of default, and to show good cause, or to establish within 45 days that they had not received the initial notice of the hearing. (Pl. Ex. A17.) Under the terms of the stipulation, the class members were not bound by the 15- and 45-day timelines, but instead by the single timeline of ten days from the mailing date of the default notice. Section 358-5.5 did not, and still does not, address the issuance of written default notice.

The 15- and 45-day requirements were eliminated when § 358-5.5 was amended,

---

[2]Although this stipulation was later vacated, defendants have since stipulated to the certification of the same class, both by letter on September 18, 2013, and by a jointly-signed stipulation so-ordered by the Court on March 10, 2014.

effective October 23, 2012. Medicaid appellants now have one year to request that their hearings be rescheduled, but are also subject to a new timeline. They must request that their hearing be rescheduled within 60 days of the date of default, or they will be unable to recover retroactive benefits for any period of lost coverage after they defaulted. *See* 18 N.Y.C.R.R. § 358-5.5(c)(1). If their request to reschedule the hearing is made 60 days or more after the default, they will only receive medical coverage prospectively, from the date of their request. *Id*. § 358-5.5(c)(2).

After § 358-5.5 was amended, plaintiffs moved to alter the stipulation so that the plaintiff class could benefit from the longer one-year timeline, and from the provision addressing retroactive and prospective coverage, which was not addressed by the terms of the stipulation. Defendants opposed the motion. Ultimately, the Court vacated the stipulation, pursuant to Fed. R. Civ. P. 60(b)(5), concluding that it was not equitable to bind defendants to both the stipulation and the amended regulation at the same time, because defendants had negotiated the stipulation with the former regulation in mind. If defendants were required to extend the new regulation to the prospective class members, the Court held that they should receive the opportunity to litigate the necessity of a written default notice in light of the new regulation. The present preliminary injunction motion provides that opportunity to both sides.

II. STANDARD OF REVIEW

"A party seeking a preliminary injunction must demonstrate (1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair

ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *MyWebGrocer, LLC v. Hometown Info, Inc.*, 375 F.3d 190, 192 (2d Cir. 2004) (internal quotation marks and citation omitted).

With respect to irreparable harm, the mere possibility of harm is not sufficient. *JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990). Plaintiffs must show that the harm is "likely" absent the requested injunction. *Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

With respect to the likelihood of success on the merits, the parties dispute which standard applies. Defendants argue that plaintiffs must show a "substantial" likelihood or a "clear showing" of entitlement to the requested relief. (Def. Mem. at 9-10 (citing *Abdul-Wali v. Coughlin*, 754 F.2d 1015, 1025-26 (2d Cir. 1985), *overruled on other grounds by* 482 U.S. 342 (1987), and *Flintkote Co. v. Blumenthal*, 469 F. Supp. 115, 125 (N.D.N.Y. 1979)).) Plaintiffs argue that they need only demonstrate a likelihood of success of better than fifty percent. (Pl. Mem. at 15 (citing, *inter alia*, *Abdul Wali*, 754 F.2d at 1025).)

The Second Circuit "has offered differing views on the appropriate standard for issuance of a preliminary injunction against governmental action." *Time Warner Cable of N.Y.C. v. Bloomberg*, 118 F.3d 917, 923 (2d Cir. 1997).

> We have sometimes required a strong showing of entitlement to a preliminary injunction against governmental action . . . at least where the injunction stays governmental action taken in the public interest pursuant to a statutory . . . scheme . . . . On the other hand, we have said that the "probability of success" standard need not always be followed merely because a movant seeks to enjoin government action . . . and we have applied the lesser standard in suits against governmental entities . . . [because] in some litigation against the government, no party has an exclusive claim on the public interest.

*Id.* at 923 (internal quotation marks and citations omitted).

In *Time Warner*, the Second Circuit concluded that the application of the lower preliminary injunction standard was justified because there were public interest concerns on both sides of the case. *Id.* Here, there are also public interest concerns on both sides. The general public would bear the cost of the default letters, but the plaintiffs represent a broad class of people receiving public assistance. Therefore, the fact that this case involves government action taken in the public interest does not automatically require the Court to impose the higher preliminary injunction standard.

Courts have also applied a higher standard in two other situations. Where the preliminary relief would provide substantially all of the relief a plaintiff seeks at trial, the Second Circuit has required the plaintiff to show a substantial likelihood of success on the merits. *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995).

> However, the terms "all the relief to which the movant would be entitled" or "all the relief sought" have also been the source of

confusion because, read literally, they appear to describe any injunction where the final relief for the plaintiff would simply be a continuation of the preliminary relief. . . . However, this application of the rule seems hard to justify . . . because the fact that the plaintiff would get no additional relief if he prevailed at the trial on the merits should not deprive him of his remedy.

*Id.* (internal quotation marks, alterations, and citations omitted).

Thus, the higher standard does not necessarily apply simply because the requested preliminary injunction closely resembles the relief sought at trial. In any event, there is a clear distinction in this case between the relief sought in the complaint and what is addressed by the preliminary injunction. The preliminary injunction applies prospectively, while the complaint seeks declaratory relief and an injunction (1) addressing defaulted hearings as far back as 2006, and (2) ordering defendants to improve the telephone system. Therefore, the preliminary injunction would not grant plaintiffs all the relief they seek at trial. *Cf. Olson v. Wing*, 281 F. Supp. 2d 476, 485-86 (E.D.N.Y. 2003) ("[The higher] standard is inapplicable here . . . because plaintiff's motion seeks only prospective relief in the form of adequate notice . . . . [The] amended complaint, in contrast, seeks issuance of new, timely, and adequate notices to all persons terminated during the DRM transition process." (internal quotation marks omitted)).

The other situation in which courts have required a more substantial showing of likelihood of success is where the preliminary relief sought is mandatory rather than prohibitory, and changes the *status quo*. "The distinction between mandatory and prohibitory injunctions is not without ambiguities or critics." *Tom Doherty*, 60 F.3d at 34. Here, for example, plaintiffs phrased their request for relief in prohibitory language—"an order…enjoining defendants from dismissing the administrative appeals of defaulting Medicaid applicants who are not given at least 10 days to respond to a written notice from defendants"—but the relief would be mandatory in effect. *See Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 835 (1994) ("[I]n borderline cases injunctive provisions containing essentially the same command can be phrased either in mandatory or prohibitory terms.").

No matter how plaintiffs' request is phrased, it would undoubtedly change the *status quo*. Defaulting Medicaid appellants do not currently receive a default notice, and plaintiffs want them to receive the same notice they received under the stipulation in this case. Since the Court vacated the stipulation, that letter has not issued, and therefore, the Court concludes that the preliminary relief sought is mandatory. *See Tom Doherty*, 60 F.3d at 34 ("A mandatory injunction . . . is said to alter the status quo by commanding some positive act."); *Abdul Wali*, 754 F.2d at 1025 (defining mandatory injunction as one which changes, rather than preserves, the *status quo*). Accordingly, the Court will apply the higher standard: plaintiffs must make a "clear showing" of entitlement to the relief requested. *See Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*, 454 F. Supp. 2d 62, 68 (E.D.N.Y. 2006) (characterizing "clear showing" standard as a heavier version of the already heavy burden "to establish the propriety of such drastic judicial intervention").

6

## III. Discussion[3]

The discussion turns first to whether plaintiffs have demonstrated a likelihood of irreparable harm, and then to whether they have made a clear showing that they are likely to succeed on the merits.[4]

### A. Irreparable Harm

"The irreparable harm requirement is the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (*per curiam*) (internal quotations omitted). "Irreparable injury is one that cannot be redressed through a monetary award." *JSG Trading Corp.*, 917 F.2d at 79. "A successful plaintiff must demonstrate that absent interim relief it will suffer an injury that is neither remote nor speculative, but actual and imminent." *Consol. Brands, Inc. v. Mondi*, 638 F. Supp. 152, 155 (E.D.N.Y. 1986).

Courts have repeatedly held that the wrongful denial of Medicaid benefits, in situations analogous to this case, is the type of non-monetary, imminent harm that is properly characterized as irreparable. *See, e.g.*, *Strouchler v. Shah*, 891 F. Supp. 2d 504, 520 (S.D.N.Y. 2012) (noting, in Medicaid case, "Second Circuit and out-of-circuit appellate law holding that the mere *threat* of a loss of medical care, even if never realized, constitutes irreparable harm"); *Olson*, 281 F. Supp. 2d at 487 (finding likelihood of irreparable harm where chronically ill Medicaid beneficiaries were deprived of aid-continuing coverage and there was evidence that many ultimately prevailed at fair hearings); *Morel v. Giuliani*, 927 F. Supp. 622, 635 (S.D.N.Y. 1995) ("The protracted denial of aid continuing benefits constitutes immediate and irreparable harm. To indigent persons, the loss of even a portion of subsistence benefits constitutes irreparable injury."); *cf. Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). Thus, the Court concludes that plaintiffs have satisfied the irreparable harm requirement.

### B. Success on the Merits

As noted above, plaintiffs must make a "clear showing" that they are likely to succeed on their due process and statutory claims.[5] In the absence of any directly-

---

[3] Neither side requested an evidentiary hearing and, in any event, the Court has determined that such a hearing is unwarranted because, even if all of plaintiffs' evidence is accepted as true, plaintiffs have failed to demonstrate a likelihood of success on their due process and statutory claims. In particular, the Court need not resolve any factual disputes regarding the adequacy of the telephone system because (as discussed *infra*), even assuming plaintiffs' facts to be true, they have failed to show any likelihood of demonstrating that such inadequacies rise to a due process violation. Thus, because plaintiffs cannot prevail on their motion even if all of their facts are accepted as true, any disputed facts are not essential to resolution of the motion, and an evidentiary hearing regarding such facts is unnecessary. *See Md. Cas. Co. v. Realty Advisory Bd. on Labor Relations*, 107 F.3d 979, 984 (2d Cir. 1997) (stating that "there is no hard and fast rule in this circuit that oral testimony must be taken on a motion for a preliminary injunction or that the court can in no circumstances dispose of the motion on the papers before it," and that "[g]enerally, the district court is not required to conduct an evidentiary hearing on a motion for a preliminary injunction when *essential* facts are not in dispute" (internal quotation marks and citations omitted) (emphasis added)).

[4] Even assuming that the higher "clear showing" standard did not apply in the instant case, the Court would reach the same conclusion under the regular preliminary injunction standard for the reasons discussed herein.

[5] The merits of plaintiffs' claims draw on both the Due Process Clause and 42 U.S.C. § 1396a(a)(3),

applicable precedent, both parties have analyzed these claims under the test set forth *Mathews v. Eldridge*, 424 U.S. 319 (1976). In an abundance of caution, the Court will apply the *Mathews* test as well, although it will first follow the Supreme Court's "well-settled practice" of analyzing the adequacy of notice under the "more straightforward test of reasonableness under the circumstances," set forth in the Supreme Court's decision in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950). *Dusenberry v. United States*, 534 U.S. 161, 167-68 (2002); *see also Snider Int'l Corp. v. Town of Forest Heights, Md.*, 739 F.3d 140, 146 (4th Cir. 2014) ("Notice and the hearing are two distinct features of due process, and are thus governed by different standards."); *John E. Andrus Memorial, Inc. v. Daines*, 600 F. Supp. 2d 563, 578 n.12 (S.D.N.Y. 2009) ("While the Matthews [sic] balancing test has been passed over by the Supreme Court in favor of *Mullane*'s reasonableness test for determining the adequacy of a method used to give notice, . . . the balancing test is still instructive.").

1. Reasonableness of Existing Notice

At the outset, it is important to distinguish the due process claims of two separate groups described in plaintiffs' submissions. One group received a fair-hearing notice (and thus had knowledge of the fair hearing) but, for a number of legitimate reasons, attempted unsuccessfully to adjourn the fair hearing. (*See* Doyle Aff. ¶ 25 (citing examples).) Plaintiffs argue that their attempts were unsuccessful because of inadequacies in defendants' telephone system, but those inadequacies do not eliminate, as a constitutional matter, the notice these claimants received. In that sense, plaintiffs' emphasis on the telephone system is misplaced.[6] Even if the system makes it difficult for this group of claimants to request an adjournment before defaulting, the amended regulations provide them 60 days *after* default (in addition to whatever time remained between their attempt to adjourn the hearing and the hearing itself) to reschedule the hearing and have their benefits restored both retrospectively and prospectively. *See* 18 N.Y.C.R.R. § 358-5.5(c)(1). As a result, this group faces virtually no risk of being unknowingly

---

which creates a statutory right to a fair hearing. The analysis under both sources of law is the same, since the statutory fair-hearing requirement "must meet the due process standards set forth in *Goldberg*." 42 C.F.R. § 431.223; *see also Granato v. Bane*, 74 F.3d 406, 408 (2d Cir. 1996) ("States are not required to participate in all aspects of the Medicaid program, but if they do participate in a given program they must comply with the federal Medicaid statute and regulations in administering that program.").

[6] Plaintiffs' primary criticism of the telephone system is that only 18% of calls seeking adjournments actually reach the automated system which provides options (as well as information about other ways to contact defendants) and leads to a wait time of approximately 6 minutes. (*See* Vollmer Suppl. Decl. ¶¶ 23-24; Mathieu Decl. ¶ 7.) However, it is not the Court's role to require the creation of a better telephone system simply because the current one is inconvenient. The constitutional requirement is notice "of the pendency of the action and afford[ing] [plaintiffs] an opportunity to present their objections," *Mullane*, 339 U.S. at 314, which is accomplished by the three existing notices and the new regulation. Moreover, the Court notes that plaintiffs' data reflects the number of *calls*, not *callers*. (*See* Vollmer Decl. ¶¶ 70-71.) Thus, even assuming *arguendo* that an individual call seeking an adjournment only has an 18% chance of reaching the automated system, a claimant making multiple calls over the course of 60 or more days is still likely to reach defendants. And of course, that same claimant may also try non-telephone methods. For these reasons, the Court concludes that this group has received notice "of the pendency of the action" and has been "afford[ed] . . . an opportunity to present their objections," *Mullane*, 339 U.S. at 314, and therefore, is not reasonably likely to prevail on the merits.

8

deprived of medical coverage: they know beforehand that they will default (because they were not able to request an adjournment), and the fair-hearing notice advises them how to contact defendants by a variety of methods in order to have their coverage restored. For example, plaintiffs acknowledge that the fair-hearing notice form advises claimants that they may request adjournments online, and claimants may also reschedule defaulted hearings online. (Vollmer Decl. ¶¶ 106-08.) The Court concludes that 60 or more days is ample time for this group to use one of these methods to reach defendants, even assuming the truth of plaintiffs' evidence about the telephone system.[7]

The second group identified by plaintiffs requires more discussion. Plaintiffs allege, through counsel, that 880 claimants never received a fair-hearing notice. (*See* Vollmer Decl. ¶ 27(a).) Without knowledge of when their fair hearing would occur, these claimants could default their claim without realizing it, and then be denied benefits at the moment they seek medical care. In fact, plaintiff alleges that 452 of these 880 claimants actually lost aid-continuing coverage upon default (*id.* ¶ 28), and plaintiffs submitted an affidavit discussing some of these cases in detail (Doyle Aff. ¶ 23).

As a general matter, however, "[d]ue process does not mandate 'actual' notice" when the government seeks to infringe on a property interest, "but rather a method of notice that is 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Oladokun v. Ryan*, 06 CV 2330 KMW, 2010 WL 3910578, at *6 (S.D.N.Y. Sept. 30, 2010) (citing *Mullane,* 339 U.S. at 314; *Rosa R. v. Connelly*, 889 F.2d 435, 439 (2d Cir. 1989)). Accordingly, "failure of notice in a specific case does not establish the inadequacy of the attempted notice; in that sense, the constitutionality of a particular procedure for notice is assessed *ex ante*, rather than *post hoc*." *Jones v. Flowers*, 547 U.S. 220, 231 (2006).

In effect, plaintiffs here ask the Court to assess their case *post hoc*, by focusing on the 880 claimants who allege that they never received a fair-hearing notice. However, the Court is bound to assess defendants' method of notice *ex ante*. From that perspective, the mailing of three different forms—the initial notice of ineligibility, the acknowledgement of a fair-hearing request, and the fair-hearing notice—is "reasonably calculated" to inform plaintiffs of the pendency of the action and their ability to object at a hearing. *Accord Rosen v. Goetz*, 410 F.3d 919, 931 (6th Cir. 2005) ("Due process does not require 'reasonably calculated' notice to come in just one letter, as opposed to two."). Multiple Second Circuit cases, in addition to the Supreme Court's decision in *Jones*, make clear that the occasional failure of this information to reach some claimants does not make the entire system unconstitutional.[8]

---

[7] A case in point is the representative couple cited by plaintiff in their memorandum of law. That couple requested a fair hearing on February 16, 2011, and allegedly never received a fair-hearing notice. (Pl. Mem. at 13.) However, the fair hearing was not set to occur until five months later, on July 18, 2011. (*Id.*) Thus, there was ample time before default ever occurred for this couple to realize that they never received a fair-hearing notice, and to seek to obtain one, using the information in the first two notices. Now, there is also an additional 60-day period after default in which this couple could take action and have their coverage restored both retrospectively and prospectively.

[8] The *ex ante* nature of this analysis makes inapposite the recent Third Circuit case cited by plaintiffs in a follow-up letter to the Court. In *Lupyan v. Corinithian Colleges Inc.*, the Third Circuit addressed the application of the evidentiary "mailbox rule" to the question whether a plaintiff received the

*See Akey v. Clinton Cnty., N.Y.*, 375 F.3d 231, 235 (2d Cir. 2004) ("As notice by mail is deemed to be reasonably calculated to reach property owners, the state is not required to go further, despite the slight risk that notice sent by ordinary mail might not be received."); *Fuentes-Argueta v. I.N.S.*, 101 F.3d 867, 872 (2d Cir. 1996) ("The courts have repeatedly upheld even the use of regular, first-class mail as a constitutionally adequate means of service."); *Weigner v. City of New York*, 852 F.2d 646, 649 (2d Cir. 1988) ("Importantly, the state's obligation to use notice 'reasonably certain to inform those affected' does not mean that all risk of non-receipt must be eliminated.").

Instead, in order to make a clear showing that they are likely to prevail on a due process claim, plaintiffs would have to provide evidence similar to that in *Jones*, where the Supreme Court found a due process violation because the government had two pre-tax sale notices returned to it, but pursued no other methods of notice before selling the property in question. 547 U.S. at 224. The return of the notices before the taking established the Government's knowledge that its method of notice was ineffective. *Id.* at 231 ("[I]f a feature of the State's chosen procedure is that it promptly provides additional information to the government about the effectiveness of notice, it does not contravene the *ex ante* principle to consider what the government does with that information in assessing the adequacy of the chosen procedure. After all, the State knew *ex ante* that it would promptly learn whether its effort to effect notice through certified mail had succeeded.").

The absence of evidence that defendants here were aware that plaintiffs did not receive fair-hearing notices makes this case more like the pre-*Jones* cases in which "the government attempted to provide notice and heard nothing back indicating that anything had gone awry, and we stated that '[t]he reasonableness and hence the constitutional validity of [the] chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected.'" *Id.* at 226 (citing *Mullane*, 339 U.S. at 315; *Dusenberry*, 534 U.S. at 170). The fact that this case involves multiple notices, each mailed separately, further underscores this point. Even assuming that 880 claimants never received a fair-hearing notice, which is what plaintiffs' counsel was told over the phone, all of those claimants must have received the initial notice informing them of their ineligibility, or else they never could have requested a fair hearing in the first place. In fact, plaintiffs acknowledge that "the very fact that the fair hearing was requested verifies that defendants properly posted the [first] letter

---

notice required by the Family Medical Leave Act. *See* -- F.3d --, 2014 WL 3824309, at *4-7 (3d Cir. Aug. 5, 2014). Due process was not at issue. Thus, the Third Circuit's holding that there was only a "weak presumption" that the notice sent via regular mail was received, and the presumption was overcome at summary judgment by the plaintiff's denial of receipt, *see id.*, addresses a separate question from the constitutional adequacy, *ex ante*, of defendants' decision to mail Medicaid notices to plaintiffs. The cases are also procedurally distinct. *Lupyan* was a summary judgment case, requiring consideration of the record in a light most favorable to the plaintiff. *Id.* at *7. Here, in contrast, plaintiffs carry the "heavy" burden to justify preliminary relief. *See Union Cosmetic Castle*, 454 F. Supp. 2d at 68. As discussed above, they have identified no evidence that defendants knew, *ex ante*, of any fair-hearing notices failing to reach plaintiffs; in fact, plaintiffs have also acknowledged that there were no delivery problems with the first two notices. For these reasons, plaintiffs have not made a clear showing that they are likely to succeed on an *ex ante* analysis of the reasonableness of defendants' decision to mail the fair-hearing notice.

to the correct address." (Vollmer Suppl. Decl. ¶ 39.)

In addition to the first letter, those claimants also would have received a second letter acknowledging their fair-hearing request,[9] and there is no evidence of any widespread problems with the delivery of either the first or second letter. Accordingly, the Court concludes that defendants at least twice "heard nothing back indicating that anything had gone awry," *Jones*, 547 U.S. at 226, and therefore acted reasonably in delivering the third letter—the fair-hearing notice—by the same means as the first two. *See Snider*, 739 F.3d at 147 ("Repeated success of first-class mail delivery suggests the reasonableness of this method."); *Luessenhop v. Clinton Cnty., N.Y.*, 466 F.3d 259, 271 (2d Cir. 2006) (noting that where initial letters of tax delinquency were sent to homeowners by regular mail and not returned as undeliverable, the County was entitled to presume that homeowner received those letters).

2. *Mathews* Balancing

The reasonableness of the current system of notice is further illustrated by consideration of the factors announced in *Mathews*:

> (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*N.Y. State Nat'l Org. for Women v. Pataki*, 261 F.3d 156, 167-68 (2d Cir. 2001) (quoting *Mathews*, 424 U.S. at 335).

Although it is clear that Medicaid benefits constitute a protected property interest, *see Wooten v. N.Y.C. Human Res. Admin.*, 421 F. Supp. 2d 737, 741 (S.D.N.Y. 2006), the risk of erroneous deprivation in the absence of an additional default notice is low, because there are already three forms notifying such claimants that their benefits are at risk and advising them of various ways to contact defendants. As noted above, the mere possibility that one of these forms may not reach some plaintiffs does not establish a violation of due process. However, even if a plaintiff only received the first two forms, he would still be aware (i) of the ineligibility determination, (ii) that defendants had received his fair-hearing request, and (iii) that he could call, write, or visit defendants (in person or online) in order to inquire further. (*See* Pl. Exs. A33, A241.)

Moreover, the information provided in the first two forms works in combination with the recent regulatory change to protect plaintiffs' due process rights. *Accord Kapps v. Wing*, 404 F.3d 105, 126 (2d Cir. 2005) ("The existence of alternate state procedures, which protect against a deprivation of due process, is without doubt

---

[9] The Court also notes that this second form, which acknowledges a fair-hearing request, provides contact information for a recipient to "inform this office of a change of address or phone number." (Pl. Ex. A33.) Furthermore, plaintiffs do not argue that changes of address are responsible for fair-hearing notices not reaching certain claimants. (*See* Vollmer Suppl. Decl. ¶ 40 ("Although some small percentage of Medicaid recipients may have relocated between the mailing of the CNS notice of adverse action and the mailing of the fair hearing scheduling notice, it is not reasonable to assume that most do.").)

11

relevant to, and may even be dispositive of, the *Mathews v. Eldridge* inquiry."). Now, claimants have 60 days *after* a defaulted hearing in which to request that their aid-continuing benefits be restored—both retroactively and prospectively—while they await a rescheduled fair hearing. *See* 18 N.Y.C.R.R. § 358-5.5(c)(1). In effect, this rule-change provides a 60-day safety net, since even claimants who never received the fair-hearing notice could have averted default *before* their fair-hearing date by relying on the information contained in the first two forms. Those claimants knew they had requested a fair hearing, and were provided with contact information by which to ascertain its date and time from defendants.[10] Even if contacting defendants is challenging for some claimants, they now have the entire time between their initial request and the fair-hearing date, plus 60 days, to do so, without losing benefits.[11]

---

[10] Plaintiffs argue that none of the three forms currently mailed to claimants explains specifically how to reschedule a defaulted hearing, but the acknowledgement of the fair-hearing request—the second form for which there is no evidence of delivery problems—provides a telephone number "[i]f you need to inquire about this request" or "the status of your case." (Pl. Ex. A238; *see also* Vollmer Decl. ¶ 40.) Plaintiffs have not shown that this number cannot be used to reschedule a defaulted hearing, and the Court concludes that this information, combined with a second telephone number for "Fair Hearing Information and assistance" provided in the initial notice of ineligibility (*see* Pl. Ex. A238) is sufficient notice of the means by which reschedule a defaulted hearing.

[11] The Court acknowledges that "a party's ability to take steps to safeguard its own interests does not relieve the State of its constitutional obligation," *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 799 (1983), and this discussion is not meant to imply that defendants need not mail the fair-hearing notice. Instead, it is meant only to illustrate one aspect of the reasonableness of defendants' method of notice: even if the fair-hearing notice fails to reach the claimant, the risk of an erroneous deprivation of benefits is still relatively low, since claimants have ample time and

Moreover, even if they miss the 60-day post-default date, they still have a year in which to restore aid-continuing benefits prospectively by rescheduling their defaulted hearing. *Id*. § 358-5.5(c)(2).

For these reasons, the probable value of the default notice is low. Although plaintiffs point to evidence that there was a 20% increase in the rescheduling of defaulted fair hearings while a default notice was sent to claimants pursuant to the parties' stipulation in this case, they have not shown that the entire increase was due to the default letter alone. The letter also contained the name and telephone number for plaintiffs' counsel, who received 5,355 calls from prospective class members. (*See* Vollmer Suppl. Decl ¶ 40 n.40.) That number is nearly half the number of rescheduled fair hearings (11,187), suggesting that a combination of the default letter and the assistance of counsel drove the increase. In any event, the Supreme Court has "never held that improvements in the reliability of new procedures necessarily demonstrate the infirmity of those that were replaced." *Dusenberry*, 534 U.S. at 172. Even if the default notice has some value, it is still a fourth letter following three others, with no evidence that defendants previously received information "indicating that anything had gone awry." *Jones*, 547 U.S. at 226. Defendants are not constitutionally compelled to do more simply because some claimants would benefit from it. *See Dusenberry*, 534 U.S. at 172 ("Other areas of the law, moreover, have for strong policy reasons resisted rules crediting the notion that, 'because the world gets wiser as it gets older, therefore it was foolish before'. . . . In

---

information (based on the first two letters and the regulations) to realize that they have not received a fair-hearing notice, and to request one by contacting defendants.

this case, we believe the same principle supports our conclusion that the Government ought not be penalized and told to 'try harder.'" (internal quotation marks and citations omitted)).

"[T]he final factor to be assessed is the public interest," which "includes the administrative burden and other societal costs." *Mathews*, 424 U.S. at 347. The financial cost of requiring the requested relief is significant to the Court's analysis, and plaintiffs have produced evidence that the total cost to the Government of mailing the written default notices during the period of the stipulation from 2011 to 2013 was $74,711.81. (Vollmer Decl. ¶ 119.) This is a considerable sum, even if it is a relatively small percentage of OTDA's annual budget. (*Id*. ¶ 120; Pl. Ex. A261.) As the Supreme Court itself noted in *Mathews*, "the cost of protecting those whom the preliminary administrative process has identified as likely to be found undeserving may in the end come out of the pockets of the deserving since resources available for any particular program of social welfare are not unlimited." 424 U.S. at 348.

Furthermore, the expense of the default notice is in addition to the expense incurred by defendants in mailing the first three letters and staffing the telephone system, to which it has made additional improvements during this litigation. (Mathieu Decl. ¶¶ 6, 9.) In combination, these methods adequately inform claimants that "the matter is pending" and they may present objections during a hearing, *Mullane*, 339 U.S. at 314, and thus plaintiffs have not made a clear showing that they are likely to succeed on their due process or statutory claims.

IV. CONCLUSION

Plaintiffs' motion for a preliminary injunction is denied because plaintiffs have failed to make a clear showing that they are likely to succeed on the merits. Based upon the current record, the Court concludes that defendants' method of notice, which already involves the mailing of three separate letters, is reasonably calculated to comply with due process. Moreover, a recent regulatory change extends the time for defaulting claimants to reschedule their fair hearings and have benefits restored both retrospectively and prospectively. Under these circumstances, plaintiffs have not made a clear showing that they are likely to succeed on the merits.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 16, 2014
       Central Islip, NY

* * *

Plaintiffs are represented by Peter Vollmer, Law Office of Peter Vollmer, P.C., 19 Hawthorne Road, Sea Cliff, NY 11579. Defendants are represented by Susan M. Connolly, New York State Office of the Attorney General, 300 Motor Parkway, Suite 230, Hauppauge, NY 11788.